On Application for Rehearing

MOORE, Judge.
This court’s opinion of August 29, 2014, is withdrawn, and the following is substituted therefor.
Fab Arc Steel Supply, Inc. (“the employer”), appeals from a judgment entered by the Calhoun Circuit Court (“the trial court”) finding that Timothy Michael Dodd (“the employee”) was permanently and totally disabled as a result of a June 23, 2010, workplace accident and awarding the employee benefits pursuant to the Alabama Workers’ Compensation Act (“the Act”), Ala.Code 1975, § 25-5-1 et seq. We affirm in part and reverse in part.

Background

On April 12, 2012, the employee filed an action in the trial court seeking benefits pursuant to the Act. The employee asserted that, on June 23, 2010, he was employed as a structural-steel-fabricator fitter with the employer; that, on that date, he sustained a work-related injury when he was unexpectedly hit in the chest and abdomen by a “C-clamp” that was attached to a steel beam weighing approximately 1,500 pounds; that, as a result of the work-related accident, he suffered injuries to his abdomen, chest, neck, and back; that he received medical treatment authorized by the employer; and that the employer had accepted liability for a “he-matoma” to the employee’s chest and abdomen but had denied liability under the Act for the injuries sustained to his lower back and cervical spine and related problems. The employee asserted that he was totally disabled as a result of the June 23, 2010, injuries.
On March 26, 2013, the trial court conducted an ore tenus hearing, at which the parties presented a joint stipulation of facts and the employee and three of his coworkers testified. The parties also admitted into evidence numerous medical records and the deposition testimony of Dr. John Valente and Dr. James White III.
On April 12, 2013, the trial court entered its judgment. In that judgment, the trial court made, among others, the following findings of fact and conclusions of law:
“48. ... [T]he [employee] has described to this Court the traumatic event with a 1,500 pound beam which occurred *1247 on June 23, 2010, which ‘pulverized him.’ The Court has considered the evidence emphasized by the [employer] and [its] position that [the employee’s] accident was no more than contact with a football. However, Drs. Valente and White confirm the permanent physical conditions the [employee] currently experiences can be a product of trauma and conclude that the accident described by the [employee] is consistent with their medical findings. The [employee] has denied experiencing any other physical trauma following the accident of June 23, 2010, and no evidence to the contrary has been provided to-the Court. The Court therefore finds that the trauma which the [employee] experienced on June 23, 2010, was sufficient so as to cause the injury and symptoms the [employee] now experiences.
“49. This Court carefully observed the [employee] during the trial [and] carefully observed his demeanor ... during his extended course of direct and cross-examination. This Court has carefully considered the evidence concerning the effects of the injury sustained by [the employee] on June 23, 2010. The Court noted the appearance of discomfort that the [employee] experienced during this trial, the difficulty he had sitting for more than 20-30 minutes as well as the discomfort and pain he exhibited when he was attempting to show his ability to extend his arms with apparent discomfort and pain in the sternum and chest. The Court notes the problems in the abdominal wall, [and] chest including costochondritis and disruption of the tissue in the sternum and abdominal area in addition to a herniated disc in the lumbar spine. The substantial evidence supports the obvious conclusion that these conditions are the result of the traumatic blow to the chest and abdomen. They are sufficiently severe to prevent [the employee] from effectively using his arms in an industrial or extended work setting.
“50. This Court is convinced that the testimony of the [employee] is credible and is further consistent with the evidence and testimony submitted before the Court. The [employee’s] history evidences a strong work ethic and on June 23, 2010, he was working for the [employer], performing the full scope of his job without limitation or restriction. The Court’s own observations are that the [employee’s] current limitations are significant and [the employee] appeared to be struggling with pain.
“51. Having considered the entirety of the evidence, the Court finds that the [employee] has experienced an injury causing permanent damage to the nerves in his upper torso or abdomen and chest. He has also injured his lumbar spine as well as his abdomen and chest as a result of the original injury which occurred on June 23, 2010. Although the [employee] indicates he has pain and symptoms in his neck, there does not at this time exist any evidence to support a course of medical treatment.
“52. The Court further specifically finds and determines that the [employee] does not have the physical ability to engage in reasonable and substantial gainful employment as a direct and proximate result of the injuries he sustained while working for the [employer] on June 23, 2010. This Court believes that this finding is consistent and reasonable, given the [employee’s] age, his education, current physical condition and past work experience. The Court does specifically find that in his current condition, [the employee] is not a viable candidate for vocational rehabilitation. The credible evidence establishes that *1248 [the employee’s] pain is consistent with the serious trauma he experienced; it is chronic, intractable, and sufficiently so severe as to limit him with many activities of daily life.
“53. The Court finds that the explanation offered by the [employer] as to the basis for [the employee’s] termination of employment on September' 1, 2010, is without merit and thus finds that the [employee] is entitled to receive temporary total disability benefits at the rate of $315.84, from September 1, 2010, through February 24, 2011, the date the [employee] was determined to have attained maximum medical improvement by company assigned physician, [Dr.] C.B. Thuss. Thereafter, the [employee] shall be entitled to permanent total disability benefits as the Judgment hereinafter directs. The Court finds that [the employee’s] condition on February 24, 2011, was totally disabling and although Dr. White, [the employee’s] personal physician, has offered a surgical intervention to [the employee’s] lumbar spine, this Court determines that in his current condition, the [employee] remains permanently and totally disabled as a result of his on-the-job injury with the [employer] on June 23, 2010. Furthermore, there is no evidence that the suggested surgery would improve the [employee’s] chest and abdomen area, the most painful conditions affecting the [employee], according to his testimony and the medical evidence.
“CONCLUSIONS OF LAW
“54. It is the trial court’s duty to determine the extent of disability. Simmons v. Goodyear Tire & Rubber Co., 631 So.2d 1055 (Ala.Civ.App.1993). In making its determination, the trial court is not bound by expert testimony, and may consider its own observations and interpretations of all of the evidence. Acustar, Inc. v. Staples, 598 So.2d 943, 945 (Ala.Civ.App.1992). A trial court ‘... is not bound to accept a physician’s assigned impairment rating and is free to make its own determination as to an employee’s impairment.’ Fuller v. BAMSI, Inc., 689 So.2d 128, 131 (Ala.Civ.App.1996). In fact, the trial court may make a finding of permanent total disability based solely on lay testimony. Carroll Construction Co., Inc. v. Hutcheson, 347 So.2d 527 (Ala.Civ.App.1977). In this case, in addition to the testimony of the [employee] and the obvious permanent injury to the [employee’s] abdomen that is clearly the result of the crushing blow the [employee] endured, at least three medical providers opined that nerve injury cannot be excluded, and that the stenosis in the lumbar spine is likely traumatically induced and a herniated disc that is consistent with the trauma and injury incurred by the [employee].
“55. Based on the Court’s Findings of Fact, the Court concludes that the [employee] is entitled to recover from the [employer], ... or its workers’ compensation carrier for workers’ compensation benefits under the Laws of the State of Alabama, and specifically concludes that the [employee] has suffered a work-related injury to his chest, abdomen, low back and spine, for which the [employer] and/or its workers’ compensation carrier shall be responsible for medical care and treatment.
“56. This Court further concludes that the [employee] was justified in seeking care and treatment on his own from Dr. John Valente, Dr. Anthony Esposito, and Dr. James G. White, III.
“57. Finally, the Court concludes that in his current condition, the [employee] is at maximum medical improvement and has been since February 24, 2011, *1249 and is awarded benefits consistent with the Judgment which follow.”
Based on the above findings of fact and conclusions of law, the trial court awarded the employee temporary-total-disability benefits from September 1, 2010, through February 24, 2011; accrued permanent-total-disability benefits from February 24, 2011, through April 11, 2013; and future permanent-total-disability benefits beginning April 12, 2013. The trial court also ordered that the employee’s right to medical benefits for all reasonable and necessary medical expenses were to remain open and that Dr. White was to be the employee’s authorized treating physician for the purpose of providing medical treatment for the employee’s work-related injuries. Finally, the trial court awarded attorney fees to the employee’s legal counsel and awarded the employee reimbursement for expenses in the amount of $2,349.14.
On May 10, 2013, the employer timely filed a postjudgment motion. Because that motion remained pending for 90 days, it was deemed denied by operation of law. See Rule 59.1, Ala. R. Civ. P. The employer timely filed its notice of appeal.

Evidentiary Background

The employee testified that he was 38 years old at the time of the trial and that he had begun working for the employer in August 2008 as a structural-steel-fabricator fitter. The parties stipulated that, before his June 23, 2010, workplace accident, the employee had been able to perform all the duties of his job with the employer. Those duties required the employee to frequently push, pull, and lift 75 pounds; to operate heavy equipment and cranes moving objects weighing up to 20 tons; to frequently bend and stoop; and to use various heavy hand tools. The employee testified that he was under no restrictions or limitations at the time of the workplace accident.
The employee testified that, on June 23, 2010, he was struck in the chest and abdomen by a C-clamp that was attached to a steel beam. According to the employee, that beam weighed approximately 1,500 pounds. The employee testified that “[t]he C-clamp ... hit me dead in my chest, belted me down, bowed me down and pulled me all the way to the ground and throwed me backwards and I had to be helped up and that’s when I went to the hospital.” The employee also testified that the C-clamp “pulverized me. Basically, it brought me down and then throwed me to the back (demonstrating).”
The employee testified that, before the workplace accident, he had not suffered low-back or leg problems, other than problems with his knee, which, he admitted, had occasionally bothered him. The employee testified that, after the accident and at the time of the trial, he had pain in his abdomen and around his lower back, “down through [his] leg,” and that his arms would go numb “from [his] neck area, from [his] back.” The employee described the numbness as radiating “up from my back and then through my arms.” He testified that he also had difficulty grasping things with his hands.
The employee admitted that he had not had the problems in his legs, i.e., the tingling and numbness, immediately after the accident; he testified that those symptoms had developed over time and that, as time had progressed, the symptoms had worsened. The employee denied that he had sustained any additional injuries or that he had been involved in any accidents since the June 23, 2010, accident.
The employee acknowledged that, after the accident, he had sought medical treatment from numerous doctors. According to the employee, he had returned to work the day after the accident and had contin *1250 ued to work for the employer with restrictions until September 1, 2010, when his employment was terminated for alleged insubordination.
According to the medical records introduced into evidence, Dr. Donald Casey treated the employee immediately after the accident on June 23, 2010. Dr. Casey diagnosed the employee with an “abdominal wall contusion, contusion of the chest wall, and abdominal wall hematoma.”[1] The employee was' allowed to return to work with restrictions of “no bending at the waist, no overhead work. No push, pull, lift greater than 5 pounds. Stand, stoop, squat to tolerance and no kneeling.”
Dr. Casey saw the employee again on June 28, 2010; in the medical notes from that visit, Dr. Casey noted that the employee had complained of low-back pain that day. Dr. Casey obtained an X-ray of the employee’s lumbar spine and found no herniation or issues with the employee’s spine. Dr. Casey prescribed a muscle relaxer and continued the employee’s job restrictions until July 6, 2010.
On July 6, 2010, Dr. Casey referred the employee to Northeast Alabama Surgical Associates, a general-surgery practice. During his September 26, 2012, deposition, Dr. Valente, a general surgeon, reviewed medical records maintained on the employee by Dr. David Smith, Dr. Roderick Johnson, and himself, all of whom were medical partners at Northeast Alabama Surgical Associates.
According to Dr. Valente, the employee had been referred to his medical practice by Dr. Casey for evaluation of his abdominal and chest injury. The employee’s first visit to his practice had been on July 12, 2010, approximately two weeks after the work-related accident, and the employee was seen by Dr. Smith on that visit. Dr. Valente testified that, according to the medical record created by Dr. Smith at the July 12, 2010, visit, the employee still had bruising on his chest and abdominal wall that day. Dr. Smith’s notes indicated that the employee had complained of “a fair amount of pain” in his sternum and mid and low back and had been unable to stand or sit upright.
Dr. Valente testified that the employee had returned for a follow-up visit on July 26, 2010, at which the employee continued to complain of pain. Dr. Johnson, who saw the employee on July 26, 2010, commented in the employee’s medical record that the employee had indicated that he could not bend over as he was required to do at work. Dr. Johnson placed work restrictions on the employee, indicating that the employee should not bend, stretch, push, or pull for the following four weeks and that he was restricted to working in a seated position for a maximum of six hours a day.
Dr. Valente testified that the employee returned to see Dr. Smith on August 4, 2010, and that, at that appointment, “CT scans and spinal films” of the employee’s back were reviewed.[2] The films of the employee’s thoracic and lumbar spine showed no abnormalities other than a “deformity in the posterior aspect of the right 7th rib.”[3] Dr. Smith noted that the em *1251 ployee seemed to be improving and that “there was really nothing to do” from a surgical standpoint. The employee was released back to Dr. Casey and was released to return to work. Dr. Valente testified that, although the films of the employee’s abdomen and back taken in July 2010 had revealed no injuries to the bones, they had revealed “a large collection of fluid in the subcutaneous tissues over the abdomen which was likely hema-toma.”
Medical records indicate that, on August 17, 2010, Dr. Casey referred the employee to physical therapy; Dr. Casey indicated in that referral that the employee had been diagnosed with low-back pain, a chest-wall contusion, and abdominal pain. The physical-therapy records reference primarily abdominal and lower-trunk pain, with some pain reported as radiating across the employee’s back, and some numbness in the fingers on his right hand.
On August 25, 2010, Dr. Casey indicated in the employee’s medical record that he had no further treatment to provide to the employee. The employee then selected Dr. C.B. Thuss as his authorized treating physician from a panel of four physicians provided by the employer. § 25-5-77(a), Ala.Code 1975. According to the medical records, the employee initially saw Dr. Thuss on September 2, 2010. At that visit, Dr. Thuss ordered an “MRI” of the employee’s cervical spine, and an “EMG,” and continued the employee’s physical therapy. On November 22, 2010, Dr. Thuss recommended that the employee see his primary-care physician because Dr. Thuss believed the employee was suffering from conditions unrelated to his workplace injury.
The employee returned to see Dr. Thuss on February 19, 2011; Dr. Thuss ordered another CT scan. On February 24, 2011, Dr. Thuss reported that the employee’s CT scan had been negative and that he had no direct findings to correlate with the employee’s complaints of “pain that radiate[d] to the employee’s right arm causing numbness then radiating to [the] back.” Dr. Thuss discontinued the physical therapy that had been previously ordered for the employee, concluding that the employee was at maximum medical improvement (“MMI”); Dr. Thuss also indicated that the employee needed a functional-capacity evaluation (“FCE”).
On March 8, 2011, the employee underwent an FCE at the offices of Bledsole Occupational Therapy. A report of the employee’s testing indicated that he had “[g]uarded efforts. Patient is extremely illness focused at this time.” The report also indicated that the evaluator had been uncertain if the employee had given a consistent effort during the evaluation because the employee had self-limited his performance “secondary to pain or apprehension of future flare-up” and had reported his pain and fatigue increasing after performing “increased benign activity.” The evaluator concluded that “no PPI [permanent partial impairment] can be suggested without definitive pain generator to explain presentation.” Although the evaluator noted that the employee lacked physical and cardiovascular conditioning due to a lack of activity, he concluded that the employee could work light to medium duty with a gradual return to full duty.
On March 14, 2011, Dr. Thuss noted the following in the employee’s medical record: “Due to FCE suggest 6 weeks gradual increase of work load as tolerated. Currently at MMI. Regular duty and no restrictions at this time. ‘0’ (zero) PPI [permanent partial impairment].”
*1252 Dr. Valente testified that, in June 2011, approximately one year after the accident, the employee returned to his office for additional treatment; Dr. Valente noted that, at that time, the employee “still wasn’t right.”[4] According to Dr. Valente, he had observed “laxity” on one side of the employee’s abdominal wall, which, Dr. Va-lente explained, meant that the employee’s abdominal muscles had involuntarily relaxed, leaving the employee with no muscle tone or muscle control at that site.[5]
Dr. Valente explained that bulging or relaxed muscles commonly occur during surgery when, after a surgeon cuts through muscle and nerves, the nerves fail to heal properly. He testified, however, that he had never seen laxity occur after a “blunt trauma,” as he described the employee’s workplace injury, but, Dr. Valente indicated, the employee’s condition provided some evidence that muscle laxity could result from a significant blunt-force trauma.
Dr. Valente testified that, because the employee had continued to complain of significant pain and had muscle laxity on only one side of his abdomen, his impression was that the “scarred area had nerve damage secondary to the trauma,” i.e., the employee’s work-related injury. He testified that he believed nerve damage was consistent with the employee’s complaints. Dr. Valente indicated that, because the employee also had had “upper extremity cervical and thoracic symptoms,” he had referred the employee to a neurologist and that the employee had not returned to him for treatment after that referral.
On cross-examination, Dr. Valente testified that, at some point during the course of his treatment with Dr. Valente’s practice, the employee had indicated that the pain he was experiencing radiated into his lower back, but, Dr. Valente testified, he had found no record or notation in the medical records maintained by Dr. Smith, Dr. Johnson, or himself to indicate that the employee had specifically mentioned pain radiating into his legs. According to Dr. Valente, the employee had indicated that his pain was primarily in his abdominal wall and chest. Although Dr. Valente testified that the trauma to the employee’s abdomen was “probably the reason” for the employee’s abdominal laxity, he acknowledged that he did not know if the employee’s neck and back issues were related to the June 23, 2010, accident.
Dr. Valente reviewed the medical records generated by Dr. Anthony Esposito, the neurologist who had evaluated the employee in October 2011.[6] According to those medical records, Dr. Esposito had ordered nerve-conduction studies, an “EMG” and a “paraspinal EMG.” According to Dr. Esposito’s medical note, the testing revealed “no evidence of cervical radiculopathy or peripheral neuropathy in the right arm at this time. Small fiber nerve injury from this patient’s crush injury cannot be excluded by this study. Clinical correlation is suggested.” The medical records maintained by Dr. Esposito indicate that the employee had reported “back pain,” but those records contain no mention of the employee’s complaining of pain radiating into his legs. Dr. Esposito’s *1253 records also do not indicate that testing was conducted on the employee’s low back or his lumbar vertebrae.
In January 2012, the employee returned to Dr. Thuss for additional treatment. Dr. Thuss’s medical records establish that, on that date, the employee reported that the June 23, 2010, accident had caused an injury to his back and that, in the previous five months, he had noticed his left leg tingling and going to sleep. The records indicate that the employee also reported that his arms were going numb, that he was unable to sit or stand for a long period, and that the level of his abdominal pain had not decreased. Dr. Thuss again referred the employee to his primary-care physician to rule out neurological issues unrelated to his workplace accident.
The parties introduced into evidence the September 12, 2012, deposition of Dr. White, a neurosurgeon with North Alabama Neurological Services. Dr. White testified that, in May 2012, the employee’s private physician had referred the employee to Dr. White for treatment and that he had seen the employee for the first time in early May 2012. After testing, Dr. White diagnosed the employee with a herniated disk at L-l and degenerative changes at L-3 and L-4. Dr. White’s records indicate that, although the employee had complained of neck pain and had had some abnormalities in his neck, Dr. White had seen nothing in the employee’s neck that needed surgical repair.
Dr. White opined that the employee’s workplace accident could “certainly” have caused his herniated disk at L-l and that a herniated disk would not have been seen on an unenhanced CT scan; Dr. White testified that he had obtained a CT scan with myelographic dye. Although Dr. White testified that if the workplace accident had caused the herniated disk at the employee’s L-l the employee would have been more likely to have radicular symptoms immediately after the accident, he acknowledged that that was not always the case. Dr. White analogized the employee’s condition to that of a person who sustains significant injuries in an automobile accident; he testified that, when an injured person has pain throughout his or her body, he or she may not notice disk pain until the pain in other parts of the body has subsided. Dr. White also testified that whether a herniated disk causes radicular symptoms “depends on how the disc is located. It may have just gotten worse over a period of time.... It just depends on how it points.”
Dr. White acknowledged that, based on the history and the symptoms reported by the employee at his initial visit, he had understood that the employee’s back and leg pain had been consistently present for two years. Dr. White also testified that
“[i]f one were to testify as an expert that [the employee’s symptoms,] within a reasonable degree of medical eertainty[,] ... are caused by the accident, they should be temporally related to the accident. So he told me the symptoms had been there since the accident. If they" occurred a year later, there’s no way to relate that to the accident.”
Dr. White, however, then added that he had noticed that the employee’s stenosis, which should have been visible on his un-enhanced CT scans and X-rays, had not been detected until the 2012 CT scan had been obtained by Dr. White. Dr. White construed that information to mean that the employee had developed stenosis in the approximately two-year period since the workplace accident had occurred. According to Dr. White, that information made it “more likely it was related to trauma if you know he didn’t have [stenosis] and it developed within two years. At that *1254 young age, it would almost have to be related to the trauma.”

Standard of Review

The Act provides that, “[i]n reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.” Ala.Code 1975, § 25-5 — 81(e)(1). It further provides that, “[i]n reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.” Ala.Code 1975, § 25-5-81(e)(2). Substantial evidence is defined as “ ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ” Ex parte Trinity Indus., Inc., 680 So.2d 262, 268-69 (Ala.1996) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)); see also Ala.Code 1975, § 12-21-12(d). This court “will view the facts in the light most favorable to the findings of the trial court.” Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App.1994), overruled on other grounds, Ex parte Trinity Indus., Inc., 680 So.2d at 269.

Analysis

We first address the employer’s argument that the trial court’s finding that “the [employee] has experienced an injury causing permanent damage to the nerves in his upper torso or abdomen and chest” is not supported by substantial evidence.
In Ex parte McInish, 47 So.3d 767, 779 (Ala.2008), our supreme court stated:
“This Court held in Ex parte Price [, 555 So.2d 1060 (Ala.1989),] that a trial court may find medical causation without the benefit of testimony from medical experts. Additionally, lay testimony may combine with medical testimony to provide proof of causation because ‘[i]t is in the overall substance and effect of the whole of the evidence, when viewed in the full context of all the lay and expert evidence, and not in the witness’s use of any magical words or phrases, that the test finds its application.’ Ex parte Price, 555 So.2d at 1063. This ‘totality-of-the-evidenee’ standard is well established by caselaw and has become a bedrock principle of law in the area of workers’ compensation law. This principle was reaffirmed in this Court’s decision in Ex parte Southern Energy Homes[, Inc., 873 So.2d 1116 (Ala.2003) ]. Although Ex parte Southern Energy Homes, in which this Court reversed a finding of com-pensability, involved a traumatic-event injury, as opposed to a cumulative-physical-stress injury, this Court nevertheless rejected a per se rule that would require expert medical testimony to prove causation in a workers’ compensation case. 873 So.2d at 1123-24.”
We conclude that, based on the totality of the evidence, the employee established through substantial evidence that he had sustained permanent nerve damage in his chest and abdomen.
It was undisputed that the employee had been capable of performing all of his duties before his workplace accident; it also was undisputed that the employee had not sustained another injury since his workplace accident. Since the date of his workplace accident, the employee had continuously complained of severe pain in his abdomen and chest that radiated out from the impact site.
The employer admits that, during his deposition, Dr. Valente testified that he had determined that the employee had suffered “nerve damage secondary to trauma” where the C-clamp had struck the employee in the abdomen and chest. Although Dr. Valente admitted that he could not *1255 definitively prove that diagnosis, he testified that nerve damage was consistent with the employee’s complaints of continuing pain in his abdomen and chest and that the muscle laxity he had observed on the employee’s abdomen at the impact site further supported his determination of nerve damage.
Dr. Valente also testified that it was “very difficult to do nerve conduction studies from here to here,” gesturing to the abdominal area, which was the site of the employee’s primary pain at that time, and, thus, that a definitive diagnosis was not available. Dr. Valente also indicated that he believed the employee’s condition had become chronic and that there was little likelihood of his condition improving due to the length of time it had existed. Additionally, after completing neurological testing on the employee, Dr. Esposito, the neurologist who evaluated the employee in October 2011, concluded that “[s]mall fiber nerve injury from this patient’s crush injury [to his chest and abdomen] [could not] be excluded by th[e] study. Clinical correlation is suggested.”[7] Finally, the trial court found the employee’s testimony regarding his constant and severe pain in his chest and abdomen to be credible.
The employer asserts that the evidence establishes nothing more than “a mere possibility” of nerve damage; however, a trial court may find that a work-related accident caused a particular injury based on circumstantial evidence even if that injury cannot be objectively or scientifically verified and defined. See Deas v. Life Church of Mobile, 622 So.2d 1313, 1314 (Ala.Civ.App.1993) (benefits awarded for hand injury although “[n]umerous medical tests were performed to determine any physiological basis for [the employee’s] complaints of extreme pain, and there was testimony that no physiological basis was found”); TAJ-Rack Div., Inc. v. Harris, 603 So.2d 1061 (Ala.Civ.App.1992); Montgomery v. Mardis, 416 So.2d 1042 (Ala.Civ.App.1982) (although doctors could not find physical cause for claimant’s back pain, benefits were awarded); and B.F. Goodrich Co. v. Lee, 271 Ala. 312, 123 So.2d 117 (1960) (inability of doctors to determine physiological reason for claimant’s disability did not preclude finding that he had compensable injury). In this case, the trial court reasonably could have relied on the combined effect of Dr. Valente’s testimony and the note contained in Dr. Espo-sito’s medical records to determine that nerve damage was the likely cause of the employee’s continuing pain in his chest and abdomen and that the condition was likely chronic and permanent. We, therefore, conclude that substantial evidence supports the trial court’s finding that the employee had sustained permanent nerve damage at the site of impact. See Ex parte McInish, supra.
The employer also asserts that the employee failed to present substantial evidence to support the trial court’s finding that the L-l herniated disk was related to the employee’s workplace accident. The employer asserts that, because of the amount of time that elapsed between the workplace accident and the onset of the employee’s radicular symptoms, the evidence fails to establish that his herniated disk was causally related to the workplace accident. Dr. White acknowledged that, if the workplace accident had caused the herniated disk at L-l, the employee would have been more likely to have had radicu-lar symptoms immediately after the accident and that, if those symptoms had not occurred until more than a year after the employee’s workplace accident, it would be *1256 difficult to relate the herniated disk to that accident.
It is almost axiomatic that a trial court may infer medical causation from circumstantial evidence consisting of the sudden appearance of an injury and symptoms immediately following a workplace trauma. See 1 Terry A. Moore, Alabama Workers’ Compensation § 7:15 (2d ed.2013). As the employer contends, a long delay in the appearance of an injury or the symptoms may weaken that inference. However, “[ajwards have also been approved when the symptoms first appear a few hours, days, or even months later but only when no intervening event has occurred, and no alternative medical explanation is given for the appearance of the symptoms.” Id. (footnotes omitted).
In this case, Dr. White specifically testified that the absence of radicular symptoms until more than a year after the workplace accident did not conclusively establish that the employee’s herniation had not been present immediately after the work-related accident. Dr. White explained that the diagnostic testing that was performed before his myelographic examination would not have been sufficient to detect that L-l herniated disk. He also stated that, although he would have expected the onset of radicular symptoms from the employee’s injury almost immediately, the herniation may have become symptomatic only later as the injury worsened. Dr. White opined that the work-related accident certainly could have caused the employee to herniate his L-l disk. From that testimony, and the absence of any intervening trauma or other, more likely, medical explanation for the injury, the trial court reasonably could have inferred that the work-related accident caused the L-l herniated disk despite the long delay in the emergence of radicu-lar symptoms.
In affirming the judgment, we distinguish this case from Ex parte Southern Energy Homes, Inc., 873 So.2d 1116 (Ala.2003), upon which the employer heavily relies. In Southern Energy Homes, Emma Riddle claimed a lower-back injury from a fall off a ladder; however, the employer in that case presented evidence indicating that Riddle had not reported an injury from the fall either to her personal physician, who was treating her for back problems at the time, or to a supervisor and that she had continued to work normally from the date of the alleged accident for approximately six months. After she left her employment, Riddle first reported the injury to her personal physician, who diagnosed degenerative disk disease, but no herniated disk. Several other physicians concurred in that diagnosis and testified that it was possible that the fall had caused Riddle’s condition, but that her complaints did not correlate to her claimed injury, and that no objective evidence could prove that connection. 873 So.2d at 1118-20. The trial court found Riddle to be permanently and totally disabled and awarded her benefits accordingly. This court affirmed the trial court’s judgment, without an opinion. Southern Energy Homes, Inc. v. Riddle (No. 2010428, Aug. 9, 2002), 876 So.2d 529 (Ala.Civ.App.2002) (table). On certiorari review, the supreme court concluded that “the only evidence of medical causation of the back injury came from Riddle’s own testimony.” 873 So.2d at 1122. The supreme court reversed this court’s judgment affirming the trial court’s judgment because “the evidence as a whole weighs heavily against finding the plaintiffs testimony alone to be substantial evidence of medical causation.” Id. As the supreme court’s opinion in Southern Energy Homes illustrates, a worker’s testimony that a work-related accident caused his or her injury alone will not be sufficient if all *1257 the other evidence in the case casts serious doubt upon the worker’s version of events and the worker’s testimony is not corroborated by the circumstances surrounding and following the alleged accident. See Winn-Dixie Montgomery, Inc. v. Purser, 154 So.3d 1025, 1034 (Ala.Civ.App.2014) (Moore, J., concurring in the rationale in part and concurring in the result).
In this case, the trial court relied on more than just the testimony of the employee to find medical causation. The trial court had before it evidence indicating that the employee had been diagnosed with a herniated disk, an injury that results from trauma of the type the employee sustained in his work-related accident. The employee complained of symptoms that correlated clinically to the objectively verified injury. Dr. White thoroughly explained that the manifestation of those symptoms after a period did not rule out the work-related accident as the cause of the injury. No doctor attributed the injury to some other cause, such as the degenerative process from aging, as was the case in Southern Energy Homes. The trial court reasonably could have concluded that the totality of the evidence, including the expert and circumstantial evidence, supported, rather than cast serious doubt upon, the employee’s claim. Unlike in Southern Energy Homes, the trial court had before it “ ‘more than evidence of mere possibilities that would only serve to “guess” the employer into liability.’ ” 873 So.2d at 1122 (quoting Hammons v. Roses Stores, Inc., 547 So.2d 883, 885 (Ala.Civ.App.1989)). Hence, we will not disturb the trial court’s finding that the work-related accident medically caused the employee’s L-l herniated disk.
The employer next asserts that, if the employee’s L-l herniated disk is deemed compensable, then the employee is not at MMI for that injury and that the trial court prematurely determined the extent of the employee’s disability. We first reject the employee’s argument on application for rehearing that, based on a stipulation of the parties, this court is foreclosed from considering that argument. The record shows that the parties did not stipulate to a date of MMI for all the employee’s injuries but, rather, stipulated only that Dr. Thuss, who, among other things, did not consider the employee’s lower-back injury to be compensable, had placed the employee at MMI on February 24, 2011. The parties specifically left open for determination by the trial court the assignment of any disability, which would include the date of MMI, as a result of the employee’s disputed injuries. Hence, the limited stipulation to which the parties agreed does not foreclose consideration of the issue whether the employee has reached MMI for all of his work-related injuries. See Wilson v. Berry Indus. Co., 451 So.2d 339 (Ala.Civ.App.1984) (wording of stipulation did not prevent trial court from determining compensability of alleged work-related injury).
In its findings, the trial court concluded that the employee had reached MMI as of February 24, 2011. However, this court is not bound by that finding if it is unsupported by substantial evidence, Ala.Code 1975, § 25-5-81(e)(2), or if the trial court erroneously applied the law to the undisputed facts to reach its conclusion. Ala.Code 1975, § 25-5-81(e)(1). Under Alabama law, MMI is reached when an employee has recovered from his or her work-related injuries as much as medically possible such that the extent of permanent disability, if any, can be estimated. Ex parte Phenix Rental Ctr., 873 So.2d 226, 229 (Ala.2003) (citing 1 Terry A. Moore, Alabama Workers’ Compensation § 13:5 (1998)). “The date of MMI indicates the date on which the claimant has reached *1258 such a plateau that there is no further medical care or treatment that could be reasonably anticipated to lessen the claimant’s disability.” G.UB.MK. Constructors v. Traffanstedt, 726 So.2d 704, 709 (Ala.Civ.App.1998).
In this case, the record contains no substantial evidence indicating that the employee had reached MMI for his work-related back injury. To the contrary, the undisputed evidence showed that Dr. White had offered the employee “surgical intervention” to treat his lumbar-spine injury. Dr. White also testified that he would also recommend other treatment for the employee’s injury, which, Dr. White indicated, could improve the employee’s back problem. The fact that Dr. White was not an authorized physician at the time he testified does not affect the admissibility or weight of his medical opinion on the issue. See Perkins v. G.C. Lingerie, Inc., 447 So.2d 796 (Ala.Civ.App.1984). The undisputed evidence further showed that the employee was willing to undergo treatment for his lower-back problem, including the surgery. In its findings, the trial court concluded that the employee was at MMI in his “current condition,” which included his untreated lower-back injury. However, based on the foregoing evidence, the only legal conclusion that could have been drawn was that the employee had not reached MMI.[8] Ex parte Phenix Rental Center, supra; and G.UB.MK. Constructors, supra.
We recognize that the employee has not reached MMI due largely to the decision of the employer to deny his claim for the L-l herniated disk. However, we have not located any Alabama authority that estops an employer who has denied medical treatment for a particular injury from arguing that an employee has not reached MMI as to that injury. But see Sunshine Jr. Stores, Inc. v. Dower, 625 So.2d 445 (Ala.Civ.App.1993) (case in which this court refused to consider argument, raised for the first time on appeal, of employer who had failed to offer surgery to injured worker that trial court had prematurely found injured worker to be permanently and totally disabled because surgery could have improved worker’s condition). As pointed out by the employee in his application for rehearing, the legislature, in promulgating the Act, generally intended for an employer to provide an injured employee prompt medical treatment, see Act No. 92-537,' § 1, Ala. Acts 1992; however, the legislature did not provide that an employer who fails to provide immediate treatment shall be prevented from asserting that the employee has not reached MMI because of the lack of such treatment. The employee essentially argues that the Act unfairly omits such a provision, but this court may not correct *1259 that perceived inequity by reading into the Act a substantive rule of law that its language does not fairly support. See Fort James Operating Co. v. Irby, 911 So.2d 727, 733-34 (Ala.Civ.App.2005).
We also do not read Ala.Code 1975, § 25-5-57(a)(4)b., to apply to this situation. That subdivision provides, in pertinent part:
“At any time, the employer may petition the court that awarded or approved compensation for permanent total disability to alter, amend, or revise the award or approval of the compensation on the ground that as a result of physical or vocational rehabilitation, or otherwise, the disability from which the employee suffers is no longer a permanent total disability and, if the court is so satisfied after a hearing, it shall alter,' amend, or revise the award accordingly.”
Section 25-5-57(a)(4)b. provides the mechanism by which an employer may petition a court to revise a prior permanent-total-disability award; it does not govern the question of when an employee reaches MMI so as to be eligible for permanent-total-disability benefits in the first place. Because an employee may not recover any permanent-disability benefits before reaching MMI, Ex parte Phenix Rental Center, supra, § 25-5-57(a)(4)b. cannot reasonably be interpreted to apply to the issue at hand.
We conclude that the trial court erred in assigning February 24, 2011, as the date the employee reached MMI. The trial court should have determined that the employee had not yet reached MMI due to the untreated condition of his back injury.
The employer next asserts that the trial court erred in awarding temporary-total-disability benefits to the employee from the date his employment was terminated based on the authority of United States Steel Corp. v. McBrayer, 908 So.2d 947 (Ala.Civ.App.2005) (temporary-total-disability benefits are not payable if, before MMI is reached, the injured employee is able to work and earn his preinjury wages, but he is prevented from working for reasons unrelated to his workplace injury), and Kiracofe v. B E & K Construction Co., 695 So.2d 62 (Ala.Civ.App.1997) (if an employee refuses to accept suitable employment, he is not entitled to temporary-total-disability benefits). The employer contends that the employee “constructively refused” suitable employment when he committed insubordinate acts that led to the termination of the light-duty job the employer had provided to the employee in 2010 to accommodate his work restrictions.
The trial court heard conflicting evidence as to the cause of the termination of the employee’s employment. One aspect of the evidence supported the employer’s contention that the employee had committed acts of insubordination that would warrant the termination of his employment. Another aspect of the evidence indicated that the employee had not committed any infraction and that the employer had unjustifiably terminated his employment. The trial court, as the finder of fact, see Caseco, LLC v. Dingman, 65 So.3d 909, 925 (Ala.Civ.App.2010), resolved the conflict in the evidence in favor of the employee by finding “that the explanation offered by the [employer] as to the basis for [the employee’s] termination of employment on September 1, 2010, is without merit.” Because that finding is supported by substantial evidence, this court is bound by it. See Edwards v. Jesse Stutts, Inc., 655 So.2d 1012 (Ala.Civ.App.1995). Hence, we cannot reverse the temporary-total-disability award on the ground that the employee’s employment was terminated due to his insubordination.
*1260 The trial court did not err in finding that the employee was entitled to temporary-total-disability benefits from the date his employment was terminated. The evidence shows that, at the time of the termination of his employment and up to the time the judgment was entered, the employee remained under extensive physical restrictions. The employer did not offer any evidence indicating that the employee had available to him any regular employment within his vocational profile that he could secure and perform while convalescing from his injury. See Fort James Operating Co. v. Kirklewski, 893 So.2d 434 (Ala.Civ.App.2004) (holding that employer has burden of proving availability of jobs to injured employee whose physical restrictions, when coupled with vocational profile, render employee prima facie unemployable). The evidence supports a finding that, once the employer terminated the employment of the employee, the employee was unable to perform his regular employment, or any other occupation, other than employment that was so limited in quality, dependability, or quantity that a reasonably stable employment market for the employee did not exist. See generally Goodyear Tire & Rubber Co. v. Bradley, 473 So.2d 514 (Ala.Civ.App.1985) (affirming temporary-total-disability award to employees for one-week period in which employer temporarily reduced workforce because, due to their injuries, employees were unable to secure or perform regular employment during layoff). Until the employee reaches MMI for his back injury, and so long as he remains in a totally disabled condition, the employer is obligated to pay him temporary-total-disability benefits. See Haywood v. Russell Corp., 611 So.2d 365, 367 (Ala.Civ.App.1992) (recognizing that the period of temporary total disability is the recovery period that lasts until MMI is reached).
The employer next asserts that the trial court erred in establishing $318.54 as the amount of the employee’s weekly permanent-total-disability payments in the event he continues to be permanently and totally disabled upon the expiration of 2,041 weeks; the employer asserts that those benefits should be $815.84. Because we are remanding the cause to the trial court for further proceedings, we pretermit consideration of this issue.
Based on the foregoing, we affirm the trial court’s judgment in part and reverse it in part, and we remand the cause for further proceedings consistent with this opinion.
APPLICATION GRANTED; OPINION OF AUGUST 29, 2014, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THOMPSON, P.J., and PITTMAN, THOMAS, and DONALDSON, JJ„ concur.

. A photograph of the employee’s abdomen taken immediately after the workplace accident is included in the record.

. The medical records indicate that Dr. Smith had repeated the same tests that Dr. Casey had performed immediately after the workplace accident, including a CT scan of the employee’s chest, abdomen, and thoracic and lumbar spine.

.The radiologist who read those films noted that “[i]t would be difficult to exclude a slightly displaced fracture on these views.” It is unclear if the radiologist was referring to a deformed rib that had been referenced imme *1251 diately preceding this note or to a displaced fracture elsewhere.

. The employee's treatment with Dr. Valente was not authorized by the employer. The employee's private physician had referred the employee to Dr. Valente on that occasion.

. Dr. Valente testified that the employee could not have voluntarily caused one side of his abdominal muscles to relax while maintaining muscle tone on the other side of his abdomen.

.The employee’s treatment by Dr. Esposito was not authorized by the employer but was based on the referral by Dr. Valente.

. It is unclear whether Dr. Esposito specifically tested for that condition.

. In Goodyear Tire & Rubber Co. v. Haygood, 93 So.3d 132 (Ala.Civ.App.2012), a worker sustained an unusually painful right-foot injury that later led to back problems from an altered gait. The trial court in that case awarded the employee permanent-total-disability benefits based on his right-foot injury alone. On appeal, the employer argued that the judgment should be reversed because the employee had not reached MMI for his back problems. This court rejected that argument, concluding that, although the trial court had not factored the back injury into its disability determination, the fact that the worker had not reached MMI for the back injury did not preclude the award of permanent-total-disability benefits.
In this case, the trial court found that the pain from the employee’s other injuries exceeded the pain from the spinal injury, but the trial court did not find that the employee was permanently and totally disabled from his other injuries alone. Hence, because the trial court in this case included the back injury when assessing the disability of the employee, the holding in Haygood does not apply to this case.